## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Aisha Pope, #228305

Case No.: 2:19-cv-10870

Plaintiff,

District Judge: David M. Lawson

Magistrate Judge: David R. Grand

v.

Corizon Health, MDOC et al

Defendants,

---

THE LAW OFFICE OF KEITH ALTMAN
Keith Altman (P81702)
*Attorney for Plaintiff*
33228 W 12 Mile Rd, Suite 375
Farmington Hills, MI 48334
(516) 456-5885
kaltman@lawampmmt.com

CHAPMAN LAW GROUP
Devlin Scarber (P64532)
Jeffrey L. Bomber (P85407)
*Attorneys for Keith Papendick, M.D.;*
*Claire Pei, M.D.; Mohammed Azimi, M.D.;*
*Shanti Gopal, M.D.; and Donna Rohrs, P.A.*
1441 West Long Lake Rd., Suite 310
Troy, MI 48098

MICHIGAN DEPT. OF ATTORNEY GENERAL
Sara Trudgeon (P82155)
*Attorney for the MDOC Defendants*
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
trudgeons@michigan.gov

(248) 644-6326
dscarber@chapmanlawgroup.com
jbomber@chapmanlawgroup.com

---

## KEITH PAPENDICK, M.D.; CLAIRE PEI, M.D.; MOHAMMED AZIMI, M.D.; SHANTI GOPAL, M.D.; AND DONNA ROHRS, P.A.'S MOTION FOR SUMMARY JUDGMENT

## PROOF OF SERVICE

NOW COME Defendants KEITH PAPENDICK, M.D.; CLAIRE PEI, M.D.; MOHAMMED AZIMI, M.D.; SHANTI GOPAL, M.D.; AND DONNA ROHRS, P.A. ("Defendants"), by and through their attorneys, CHAPMAN LAW GROUP, and bring this Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7.1, stating as follows:

1.     Plaintiff, Aisha Pope, brings this lawsuit alleging that Defendants committed deliberate indifference under 42 U.S.C. § 1983 by allegedly delaying or denying proper medical care concerning her colon cancer. (**ECF No. 1**).

2.     On November 25, 2020, this court ruled that the only remaining claim against these Defendants is the eighth amendment deliberate indifference claim and dismissed all other claims for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6). (**ECF No. 54, PageID.24**).

3.     For the reasons set forth in the Brief accompanying this motion, there is no genuine issue of material fact that Plaintiff cannot support deliberate indifference claims against Defendants, Dr. Papendick, Dr. Pei, Dr. Azimi, Dr. Gopal, and PA Rohrs, and summary judgment is proper.

4.     The undersigned emailed Plaintiff's counsel on September 9, 2022, requesting concurrence in this motion but concurrence was denied.

WHEREFORE, Defendants KEITH PAPENDICK, M.D.; CLAIRE PEI, M.D.; MOHAMMED AZIMI, M.D.; SHANTI GOPAL, M.D.; AND DONNA ROHRS, P.A. respectfully request that this Honorable Court grant Defendants Motion for Summary Judgment and provide any and all further relief that this Court deems just and equitable.

Respectfully submitted,
CHAPMAN LAW GROUP

Dated: September 9, 2022
/s/Devlin K. Scarber
Devlin Scarber (P64532)
Jeffrey L. Bomber (P85407)
Attorneys for Keith Papendick, M.D.;
Claire Pei, M.D.; Mohammed Azimi, M.D.;
Shanti Gopal, M.D.; and Donna Rohrs, P.A.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com
jbomber@chapmanlawgroup.com

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN

Aisha Pope, #228305

      Plaintiff,

v.

Corizon Health, MDOC et al

      Defendants,

Case No.: 2:19-cv-10870
District Judge: David M. Lawson
Magistrate Judge: David R. Grand

---

THE LAW OFFICE OF KEITH ALTMAN
Keith Altman (P81702)
*Attorney for Plaintiff*
33228 W 12 Mile Rd, Suite 375
Farmington Hills, MI 48334
(516) 456-5885
kaltman@lawampmmt.com

MICHIGAN DEPT. OF ATTORNEY GENERAL
Sara Trudgeon (P82155)
*Attorney for the MDOC Defendants*
P.O. Box 30217
Lansing, MI 48909
(517) 335-3055
trudgeons@michigan.gov

CHAPMAN LAW GROUP
Devlin Scarber (P64532)
Jeffrey L. Bomber (P85407)
*Attorneys for Keith Papendick, M.D.;*
*Claire Pei, M.D.; Mohammed Azimi, M.D.;*
*Shanti Gopal, M.D.; and Donna Rohrs, P.A.*
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com
jbomber@chapmanlawgroup.com

---

## BRIEF IN SUPPORT OF KEITH PAPENDICK, M.D.; CLAIRE PEI, M.D.; MOHAMMED AZIMI, M.D.; SHANTI GOPAL, M.D.; AND DONNA ROHRS, P.A.'S MOTION FOR SUMMARY JUDGMENT

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

INDEX OF AUTHORITIES..........................................................................................iii

INDEX OF EXHIBITS................................................................................................iv

STATEMENT OF ISSUES PRESENTED..................................................................v

CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT.........vi

STATEMENT OF MATERIAL FACTS ...................................................................1

LEGAL STANDARD................................................................................................17

LEGAL ARGUMENT...............................................................................................18

A.  THERE IS NO GENUINE DISPUTE THAT THE DEFENDANTS' ACTIONS DID NOT CONSTITUTE DELIBERATE INDIFFERENCE………………….. 18

1. PLAINTIFF CANNOT SATISFY THE OBJECTIVE COMPONENT…...…..20

2. PLAINTIFF CANNOT SATIFY THE SUBJECTIVE COMPONENT…..…....22

B.  SUMMARY DISPOSITION IS PROPER HERE SINCE PLAINTIFF HAS NO REQUISITE EXPERT TESTIMONY TO SUPPORT DELIBERATE INDIFFERENCE OR DAMAGES…………………………………………..27

RELIEF REQUESTED.............................................................................................29

# INDEX OF AUTHORITIES

## CASES

*Adickes v. S.H. Kress & Co.,* 398 U.S. 144 (1970)............................................ vii, 17

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242 (1986)...................................... vii, 17

*Anthony v. Swanson*, 701 Fed. Appx. 460 (6th Cir. 2017)……………………..28

*Blackmore v. Kalamazoo Cty.*, 390 F.3d 890 (6th Cir. 2004)…………….19, 21, 28

*Blaine v. Louisville Metro. Gov't*, 768 Fed. Appx. 515, 526 (6th Cir. 2019)………20

*Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001)……………………19, 20

*Duchon v. Cajon Co., 791 F.2d 43 (6th Cir. 1986)*..................................................17

*Estelle v. Gamble*, 429 U.S. 97 (1976) .............................................................. vii, 18

*Farmer v. Brennen*, 511 U.S. 825, 834 (1994)………………………………..18, 19

*Garretson v. City of Madison Heights*, 407 F.3d 789 (6th Cir. 2005)…………….22

*Gibson v. Matthews*, 926 F.2d 532 (6th Cir. 1991)…………………………...vii, 22

*Johnson v Karnes*, 398 F.3d 868, 875 (6th Cir. 2005) ……………………………26

*Napier v. Madison County*, 238 F.3d 739 (6th Cir. 2001)……..……………...21, 28

*Phillips v. Tangilag*, 14 F. 4th 524 (6th Cir. 2021)…………………………...27, 28

*Scott v. Harris*, 550 U.S. 372 (2007) .......................................................................18

*Westlake v. Lucas*, 537 F.2d 857 (6th Cir. 1976)........................................... 19, 26

*Wiley v. Henry Ford Cottage Hosp*., 257 Mich. App. 488 (2003)………………..27

*Williams v. Mehra*, 186 F.3rd 685 (6th Cir. 1999) ................................................ viii

*Wilson v. Seiter*, 501 U.S. 294 (1991) ............................................................vii, viii

*Youngberg v. Romeo*, 457 U.S. 307 (1982) ............................................................26


## STATUTES

42 U.S.C. § 1983 ................................................................................................. vii, 1


## FEDERAL RULES OF CIVIL PROCEDURE

Fed. R. Civ. P. 56 ............................................................................................. vii, 17

## <u>INDEX OF EXHIBITS</u>

**EXHIBIT A**          Relevant Portions of Plaintiff's MDOC Medical Records

**EXHIBIT B**          Expert Report of Dr. Thomas Fowlkes, M.D.

**EXHIBIT C**          Expert Report of Joel Appel, D.O.

**EXHIBIT D**          Medical Records of Family Medicine Urology/Gynecology

**EXHIBIT E**          Affidavit of Dr. Mohammed Azimi, M.D.

**EXHIBIT F**          Affidavit of Dr. Claire Pei, M.D.

**EXHIBIT G**          Affidavit of Dr. Shanti Gopal, M.D.

**EXHIBIT H**          Affidavit of Keith Papendick, M.D.

**EXHIBIT I**          Affidavit of Donna Rohrs, P.A.

## <u>STATEMENT OF ISSUES PRESENTED</u>

WHETHER THE COURT SHOULD GRANT SUMMARY JUDGMENT TO KEITH PAPENDICK, M.D.; CLAIRE PEI, M.D.; MOHAMMED AZIMI, M.D.; SHANTI GOPAL, M.D.; AND DONNA ROHRS, P.A., WHERE THERE IS NO GENUINE ISSUE OF MATERIAL FACT REGARDING PLAINTIFF'S CLAIMS AGAINST THEM.

Defendants Answer:                      YES.
Plaintiff Answers:                       NO.

## <u>CONTROLLING/APPROPRIATE AUTHORITY FOR RELIEF SOUGHT</u>

Under Fed. R. Civ. P. 56, summary judgment is proper if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment is appropriate if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). In a 42 U.S.C. § 1983 case, in order to find any defendant liable, liability "must be based on the actions of that defendant in the situation that the defendant faced, and not based on any problems caused by the errors of others." *Gibson v. Matthews*, 926 F.2d 532, 535 (6th. Cir. 1991).

A claim made by an inmate or detainee that his constitutional right to medical treatment was violated is analyzed under the Eighth Amendment. *See Estelle v. Gamble*, 429 U.S. 97 (1976). To state a 42 U.S.C. § 1983 claim for a violation of a prisoner's Eighth Amendment rights due to inadequate medical care, the prisoner must allege facts evidencing a deliberate indifference to serious medical needs. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle*, 429 U.S. 97. To succeed on a claim of deliberate indifference, Plaintiff must satisfy two elements, an objective one and a subjective one. He must show he had a serious medical need, and he must show that defendant, being aware of that need, acted with deliberate indifference to

vi

it. *Wilson v. Seiter*, 501 U.S. 294, 300 (1991); *Williams v. Mehra*, 186 F.3rd 685, 691 (6th Cir. 1999).

## I. <u>STATEMENT OF MATERIAL FACTS</u>

On March 25, 2019, Plaintiff, filed her Complaint in this matter alleging that Defendants violated her Constitutional Rights under 42 U.S.C. § 1983 (**ECF No. 1**, **PageID.5**).  In short, she claims that the herein Defendants committed deliberate indifference by allegedly delaying or denying proper medical care concerning her colon cancer.

Plaintiff, Aisha Pope, age 50, was incarcerated in the Michigan Department of Corrections (MDOC) at the Women's Huron Valley (WVH) facility from approximately 2013 to 2020.  Upon admission her medical history included bipolar disorder, antisocial personality disorder, chronic anemia which had previously required blood transfusions and iron and vitamin supplementation, and no known family history of cancer or a genetic disorder.

In January 2016, during a consult regarding her psychiatry medications, Ms. Pope reported to the WHV psychiatrist that "she fears worsening anemia, as in her past." (MDOC records, pg. 2). There were no reported concerns to the herein Defendants prior to this date.  The psychiatrist ordered routine lab work, which showed mild anemia (Hgb 9.9) (*Id.* at 7).  On February 18, 2016, Ms. Pope was referred for a gynecology consult. At this time, she was 43-years old.

On March 7, 2016, Ms. Pope saw Dr. Azimi, providing a history of anemia that "began year(s) ago" "(long history of chronic anemia since childhood, had been

transfused in past, given shots for anemia every few years."). Dr. Azimi noted that there was no menorrhagia, abdominal pain, black stools, diarrhea, jaundice, or weight loss. Dr. Azimi referred Ms. Pope to Dr. Pei for her anemia. (*Id.* at 9-11).

On April 25, 2016, Ms. Pope was seen by Dr. Pei for hemoptysis (coughing up blood) which had started about a week ago. Ms. Pope denied any history of malignancy or significant weight loss, and noted her history of smoking. Dr. Pei noted that the anemia symptom began 30 years ago and developed from an iron deficiency and had previously been managed with iron supplements. The associated symptom included chills. Dr. Pei further noted that there was no abdominal pain, black stools, bone pain, brittle nails, chest pain, constipation, fatigue, joint pain, low blood pressure, syncope, tachycardia, nor vomiting. (*Id.* at 22). Dr. Pei noted that because the coughing episodes were occurring only at bedtime, she suspected gastroesophageal reflux (GERD) or allergy etiology, and also determined that lung abnormalities needed to be ruled out given history of smoking. Dr. Pei also planned to screen for autoimmune disease such as sarcoidosis or others. Dr. Pei requested a special accommodation pillow at night to prevent GERD, Zantac for GERD, a nasal spray for allergy, a script for iron tablets twice daily for the anemia, and Dulcolax to help counter any constipation effects from the iron medication. She also noted that the MDOC was requesting Henry Ford Records concerning Ms. Pope's report of a mild heart attack in 2011. Dr. Pei advised Ms. Pope to Kite for any acute concerns.

She planned to see Ms. Pope in two weeks to follow-up on the hemoptysis and in three months to follow-up on the anemia and review labs. (MDOC records at 24-27).

The April 25th chest x-ray ordered by Dr. Pei showed no active disease (*Id.* at 35) and labs done this day showed Ms. Pope's hemoglobin to have risen to 11.5 g/dL., which is the "mild" range. (*Id.* at 37). A repeat lab on May 13th ordered by Dr. Pei Hgb was 11.1 g/dL. (**Id.** at 37). On May 18th, Dr. Pei reviewed this lab result and noted that Ms. Pope's Hgb was stable and that she would continue the iron tablets as prescribed.  Another repeat lab from June 6, 2016, indicated Hgb of 10.8 g/dL, still in the moderate range. Dr. Pei reviewed the labs and saw Ms. Pope on June 7th, where she noted that she was negative for abdominal pain, blood in stool, change in bowel habits, decreased appetite, hematemesis, melena, and rectal bleeding. (**Id.** at 40).  She noted Ms. Pope's history of a negative DRE test with Dr. Azimi on March 7, 2016.  She also noted that Ms. Pope's anemia began after having her first child and that she had stopped taking iron pills when she came to prison three (3) years prior.  Dr. Pei documented that the 10.8 Hgb was "stable," and that she would increase the iron pill, continue with labs and monitoring, and would schedule a follow-up visit. (***Id.*** at 43).

On September 14, 2016, a repeat lab showed Hgb of 10.6 g/dL.  On September 16, 2016, Dr. Pei reviewed the labs and noted that Ms. Pope's lipid profile was improving, she did not have diabetes, and her Hgb was stable. Dr. Pei continued the prescription for iron tablets. (**Id.** at 55).  On September 26, 2016, Dr. Pei saw Ms. Pope for an office visit and noted that the anemia was improving with the iron pill, a normal abdominal exam, and that she would obtain a fasting lab prior to the next visit.  She also recommended a low fat and low salt diet, and regular exercise.  (**Id**. at 57-59).   On October10, 2016 Dr. Azimi saw Ms. Pope because of her complaints of symptoms of perimenopause.  He started her on a trial of hormone replacement therapy (HRT) for three months with a follow-up appointment then. (***Id.*** at 65-66). In October 2016, Dr. Pei discontinued the Zantac prescription ((***Id.*** at 69-70).  On January 11, 2017, Dr. Azimi saw Ms. Pope again for a gynocology visit. She wanted to stop the HRT because of weight gain and because she passed a blood clot. Her weight was 171 pounds, and her exam was unremarkable. Dr. Azimi also ordered lab tests to follow-up on the anemia. (***Id.*** at 75-76). On January 18, 2017, Dr. Azimi reviewed Ms. Pope's lab results which showed an Hgb of 10.5.  (***Id.*** at 81).

On January 30, 2017, Ms. Pope admitted to not taking the iron as prescribed. (***Id.*** at 83).  In mid-March Ms. Pope refused to pick-up her next month's supply of the iron tablets prescription.  On March 29, 2017, Ms. Pope had repeat lab tests which showed a Hgb level of 11.5 g/dL. On March 30, 2017, Dr. Pei noted that her

4

Hgb had increased from 10.6 and that she would review with patient on the next visit (*Id.* at 30). On April 18, 2017, Dr. Azimi saw Ms. Pope for another gyn evaluation. He noted no menses in five months, pelvic pain not relieved with over-the-counter pain medications, an unremarkable pelvic exam and that her uterus was not palpable due to her weight. Dr. Azimi ordered a pelvic ultrasound with a plan to follow-up after the ultrasound.  He submitted a 407 request for ultrasound (*Id.* at 91-92).  In the MDOC, referrals for off-site procedures and known as 407s.

On April 19, 2017, utilization management physician Dr. Papendick reviewed and approved the ultrasound request the next day. On April 21, 2017, the pelvic ultrasound was unremarkable except two small uterine fibroids. (*Id.* at 91-99). On May 9, 2017, Ms. Pope was seen by Dr. Pemrose, who noted that her anemia was improved, prescribed medications, and planned to see Ms. Pope again in six months. *Id.* at 105-107). On May 15, 2017, for the first time, Ms. Pope complained of regularly having blood in her bowel movements. She was given hemoccult cards (to test for blood in the stool). On May 17, 2017, she complained of passing large clots rectally and had positive stool cards (*Id.* at 115).  On May 22, 2017, Dr. Gopal evaluated Ms. Pope for "blood in stool for past few days." (*Id.* at 118). Dr. Gopal attempted to admit Ms. Pope to the infirmary for further monitoring or necessary care, but she refused. A follow-up visit was planned.  On May 25, 2017, Dr. Gopal saw Ms. Pope again. She complained of abdominal pain and cramps and having

blood in her stool. (*Id.* at 124). Dr. Gopal noted that her hemoglobin was "10.8 on 5/24/2017 down from 11.5 on 3/29/2017, MCV and serum iron OK." (*Id.* at 124). She had normal vital signs and weighed 168 pounds. There were no complaints of vaginal bleeding, no weight loss, no blood in urine. Dr. Gopal ordered follow-up blood tests and made a referral for a colonoscopy. (*Id.* at 132). On May 30, 2017, Dr. Papendick reviewed the referral request and approved the colonoscopy. (*Id.* at 137). This all occurred within 15 days of complaints of blood in stool. On June 7, 2017, her Hgb was 11.1 g/dL. (*Id.* at 973). On June 13th, Dr. Gopal ordered Ms. Pope to be admitted to the infirmary for complaints of continued rectal bleeding and abdominal pain. The MDOC medical staff noted that recent lab indicated "no critical results present." (*Id.* at 152-154). Her pending colonoscopy was noted, and she was to remain in the infirmary until her colonoscopy. A Hgb drawn 6/21/2017 was 10.2 g/dL.

On July 5, 2017, she underwent her colonoscopy at Henry Ford Allegiance, which showed: (a) Small internal hemorrhoids; (b) A 40 mm ulcerated polyp at the splenic flexure was suspicious for malignancy and was biopsied; (c) the pathology report on the biopsy showed invasive, moderately differentiated adenocarcinoma; (d). Special stains for microsatellite instability showed negative MSH6, "consistent with microsatellite instability." (*Id.* at 1049).

6

On July 10, 2017, Ms. Pope requested to be discharged from the infirmary, her colonoscopy report was pending, and she was clinically stable.   Dr. Gopal approved her discharge from the infirmary and scheduled an appointment to discuss results. (*Id.* at 279-280). Also, later on July 10th, Dr. Gopal received the colonoscopy results with pathology and submitted a 407 request referring Ms. Pope to a surgeon for resection that same day. (*Id.* at 285-286).   On July 11th, Ms. Pope did not show for her appointment to follow-up on her anemia. (*Id.* at 290). Dr. Papendick approved the request for surgical referral on 7/12/2017 (*Id.* at 293-294).

On July 18, 2017, within 15 days of her colonoscopy and 8 days of receiving the test results, Ms. Pope went for surgical consultation at Henry Ford Allegiance Health in which the surgeon requested a preoperative workup including labs and computerized tomography (CT) scans of the chest, abdomen, and pelvis were recommended along with cardiology evaluation.   After these preoperative tests the surgeons planned a robotic-assisted laparoscopic left hemi-colectomy. (*Id.* at 1174-1176). Also on July 18th, the same day, Dr. Gopal reviewed the surgeon's recommendations and submitted a 407 request for the preoperative tests, which also required a cardiology consult for a cardiac risk stratification (*Id.* at 303-304, 308-310). On July 19, 2017, within one day of the request, Dr. Papendick approved the CT scans and the cardiology consult (*Id.* at 318-319).

On July 26, 2017, Dr. Gopal again attempted to see Ms. Pope to discuss her medical diagnosis.  However, as he was trying to explain her cancer diagnosis, Dr. Gopal noted she refused to cooperate, "was very argumentative and rude" and did not want to listen and kept arguing." "She was escorted out of the office because of inappropriate behavior." Dr. Gopal would need to reschedule her.   (*Id.* at 328-329). Dr. Gopal also continued prescription pain medication (Ultram).  On August 4, 2017, Ms. Pope was seen by Dr. Gopal who noted the pending workup, provided a wheelchair for distance, ordered no prolonged standing, filed paperwork for the Choices program and re-prescribed her pain medication and iron supplementation. Her exam was unremarkable, and her weight was 168 pounds. (*Id.* at 338-341).

On August 19, 2017, Ms. Pope was admitted to the Choices program that day and she had her CT scans that day. Her weight this day was 172 pounds.  The CT scans of her chest, abdomen, and pelvis showed no evidence of metastatic disease (*Id.* at 364-365, 1177-1178).

On August 22, 2017, Dr. Gopal saw Ms. Pope for abdominal pain. Her vital signs were normal, her weight was 172 pounds, and her exam was unremarkable. He discontinued the Ultram and provided Tylenol for pain and Naproxen as needed. (*Id.* at 376-377).  On August 23, 2017, Ms. Pope refused to show for a pelvic ultrasound appointment. On 8/28/2017 Dr. Gopal started Ms. Pope on extended-release MS Contin (morphine) for pain rather than Tylenol #3. (**Id.** at 386-387).

On August 31, 2017, Ms. Pope appeared for her cardiology appointment at Michigan Heart.  She reported a cardiac history and prior abnormal stress test in 2010, and the cardiologist recommended a nuclear medicine stress test and indicated that the results would determine if she would be cleared for surgery. (*Id.* at 1191-1192).  On September 1, 2017, Dr. Gopal requested the nuclear stress test. On September 6th, Dr. Papendick approved the request. The test was performed on 10/3/2017. (*Id.* at 396-400, 402-404).  On September 29, 2017, Dr. Gopal reviewed that Ms. Pope's repeat Hgb which was 9.1 g/dL and stable from a month earlier. (*Id.* at 414, 1012)  On October 4, 2017, records showed Ms. Pope's Hgb remained stable at 9.6 g/dL (*Id.* at 983). On 10/9/2017 Ms. Pope was cleared for surgery by the cardiologist. (*Id.* at 427). The very next day, October 10th, Dr. Gopal referred Ms. Pope for the robotic assisted laparoscopic left hemicolectomy, submitting a 407 request.  On October 11th, in response to Ms. Pope's complaints of severe abdominal pain. Dr. Pei ordered medications. (*Id.* at 428-430).  However, Ms. Pope refused admission to the infirmary. (*Id.* at 430-31). On October 13th, another UM physician (not Dr. Papendick) approved laparoscopic or open surgery but noted that "the medical necessity of robot-assisted surgery is not demonstrated." (*Id.* at 433-434).[1]

---

[1] This did not impede the surgery, which was ultimately performed on November 22, 2017.

On October 20, 2017, Ms. Battle of the MDOC staff noted that the MDOC was having difficulty scheduling Ms. Pope's surgery. Ms. Battle noted that she called the surgeon's office and was advised that the clearance paperwork was on his desk but that the surgeon had been on vacation would not be returning until November 2, 2017. (*Id.* at 439). <u>The coordination of outside procedures is left to MDOC staff, custody department, and outside providers, not the herein Defendants.</u> On October 24th, Dr. Gopal saw Ms. Pope and discussed her anemia and hemoglobin stability and informed her that her stress test was normal, and she was cleared for surgery. (*Id.* at 441-442).

On November 22, 2017, Ms. Pope had a robotic assisted left hemicolectomy by Dr. Narkiewicz without complications. (*Id.* at 1170-1171). On November 25, 2017, she was discharged from the hospital with pain medication, blood thinner, and a follow-up appointment in two weeks. (*Id.* 1165-1166). On November 28, 2017, Dr. Papendick promptly approved the follow-up appointment. (*Id.* at 482-483). Ms. Pope attended the appointment on December 5, 2017.

On December 6, 2017, the next day, Dr. Pei reviewed the surgeon's recommendations and made those requests for Ms. Pope. (*Id.* at 510-511, 518-519) Dr. Papendick approved the referrals the next day. Dr. Pei also ordered topical vitamin E cream to the incision scar twice a day for three months as had been recommended by the surgeon and ordered a carcinoembryonic antigen (CEA) level

in three months. (*Id.*)   On December 22, 2017, Ms. Pope had her hematology

oncology appointment and was then seen by PA Rohrs in follow-up on December

29, 2017 (*Id.* at 550-551). PA Rohrs reviewed the oncology doctor's report and noted

that no chemotherapy would be needed but that the following recommendations

should be considered: (1) baseline CEA, (2) CEA every three to six months, then

every six months to year five, and genetics consult for Colaris for Lynch. (*Id.* at 562-

566).   Because Ms. Pope had repeatedly been caught "cheeking" her MS Contin

medications, PA Rohrs also successfully requested that the nursing staff go outside

MDOC's normal policy and allow her to take it at noon and every night. She also

discussed with Ms. Pope the Colaris/Lynch testing process and advised Ms. Pope

that she would be making a request to the acting chief medical officer (ACMO) for

the Colaris testing for Lynch Syndrome (*Id*., at 562-564). (Colaris is the brand name

of one panel of tests for Lynch Syndrome.) (**Ex B**, Fowlkes Expert Report, pg. 13).

On December 29, 2017, PA Rohrs saw Ms. Pope in follow-up. Because Ms.

Pope complained of not having received her vitamin E cream yet, PA Rohrs followed

up with the pharmacy and issued her some antibiotic cream to use on the scar.  Also,

on December 29th, PA Rohrs submitted referrals for a four-month oncology follow-

up and for testing for Lynch Syndrome. (*Id.* at 566-569) The ACMO for Corizon

and MDOC, approved the Colaris testing for Lynch Syndrome (*Id.* at 569).   An

alternative treatment plan (ATP), was issued for the oncology follow-up, noting that

"Surveillance is completed on site by MSP (medical site provider) utilizing NCCN (National Comprehensive Cancer Network) guidelines." (*Id.* at 570).

On January 16, 2018, PA Rohrs saw Ms. Pope and noted the Lynch testing kit was ordered by the nursing staff, another lab was ordered to recheck anemia, and that she would recheck patient and labs in three weeks to make sure stable. She also referred Pope to a dietician to see if she could continue getting a special snack bag (**Id.** at 577-578). On January 23, 2018, Dr. Azimi performed a gyno evaluation and endometrial biopsy, which was negative (**Id.** at 581-583, 614, and 982). On January 24, 2018, the nursing staff attempted to collect the blood for the Colaris test. However, Ms. Pope refused and wanted more information. The nurse noted that this test had been discussed with patient twice before and would be discussed again on upcoming appointment. (**Id.** at 586-587). On February 6, 2018, PA Rohrs met with Ms. Pope, explained again about the testing for Lynch Syndrome and documented:

> Pt had a left colectomy on 11/22/17 for colon CA. This was staged at T3N0. Oncologist recommended testing for Lynch Syndrome. When RN Supervisor met with pt she refused to sign the consent form. Today pt says she had questions that she had but did not recieve the answers she needed to make her feel comfortable signing the consent. At previous appointments Lynch syndrome was explained to the pt and the reason testing was requested and ACMO approved was also explained. Today, Lynch syndrome as explained to the patient again and 2 handouts reviewed and given to the pt. We talked about needing to know if she was positive for Lynch syndrome because follow up for colon cancer would likley change and surveillance for other cancers associated with Lynch syndrome would need to be scheduled. Also discussed that if the test is positive that this would be important information for her family as they should be tested as well. Pt also had concerns that she did not want to be charged for the test. Explained to pt that testing had been approved by the ACMO so she will not have to pay for testing. Pt signed consent for the testing. Reviewed with pt again that if testing is positive will request a genetic counselor appt.

(**Id.** at 598). Shortly thereafter, the MDOC nursing supervisor told PA Rohrs that the approval given by the ACMO was not satisfactory for UM approval for the Colaris testing (**Id.** at 605-606). On February 7, 2018, she submitted the request for the

12

genetic testing to the UM department (*Id.* at 603-608). On February 9, 2018, Dr. Papendick did not initially approve the request and he requested further information about the testing (*Id.* at 609-610).  On February 15, 2018, PA Rohrs responded to Dr. Papendick's request for additional information by providing detailed information from UpToDate on Lynch Syndrome and the cancer screenings recommended if that diagnosis is made. Dr. Papendick again deferred the request and responded that "If resubmitting, the MMR and MSI testing should be included." (*Id.* at 623-625) (MMR and MSI testing refers to the DNA Mismatch Repair and Micro-satellite Instability testing results which had been performed on the initial colonoscopy biopsy specimen) (**Ex B**, Fowlkes Report). On February 16, 2018, Ms. Pope was noted again to be "still trying to cheek" her morphine pain pill. (*Id.* at 622)

On March 7, 2018, PA Rohrs saw Ms. Pope and performed a detailed analysis of the MMR Predict model that Dr. Papendick had recommended.[2]  PA Rohrs noted that the surgeon had not done MSI testing at the time of surgery. She ordered stool cards, abdominal and lumber x-rays, and emailed the regional medical director (RMD) to consider whether any appeal was necessary regarding Colaris testing.  (*Id.* at 645-647).

---

[2] The MMR Predict Model is a prediction model which assesses the likelihood of the presence of Lynch Syndrome without genetic testing. (**Ex B**, Fowlkes, pg. 22)

On March 10, 2018, MDOC staff documented that Ms. Pope "has had consistent reported cheeking attempts" of both her noon and bedtime morphine doses and "is <u>selling</u> MS Contin 30 mg on yard." (*Id.* at 659)  On March 13, 2018, PA Rohrs again emailed the RMD regarding Colaris testing approval, and further was advised by the ACMO to increase Ms. Pope's iron. (*Id.* 662-663).  On March 15, 2018, PA Rohrs ordered additional thyroid tests and she again requested an oncology follow-up because of Ms. Pope's abdominal pain and elevated CEA shown on recent tests. (*Id.* at 670-671, 684-686). Dr. Papendick approved the request on 4/2/2018 (*Id.* at 690-691) On 4/5/2018 PA Rohrs had another visit with Ms. Pope and thoroughly explained the status of her treatment and the reasons that the Colaris testing was not being approved yet, which was due to the Corizon oncologist's review of inconsistencies in the surgical pathology report:

> Plan comments:  1) spent approx 40 minutes with pt, informed her that Oncology visit has been aprroved. Long discussion regarding the genetic testing for Lynch syndrome. I am currently waiting to hear back from the Regional Medical Director about appealing the ATP of Colaris test. RMD had discussed with Corizon Oncologist who reviewed the microsatellite instability report and felt that this indicated +Lynch. I reviewed the microsattelite instability report and Oncology recommendations for Lynch testing due to pt's yound age at dx and microsattelite instabilty with onsite Physician who recommended emailing the RMD again to request the testing which I did today 4/5/18. Explained this to pt. Will notify pt when hear back from RMD. Continue to follow q 2 weeks. Pt understands but expresses frustration.
> 2) sent email to RN Supervisor regarding ice chips3)
> 3) reviewed 3/16/18 labs with pt. She says she is not taking Zocor and has not for awhile, LDL wnl, d/c'd zocor, kited for bisacodyl but said bms normal today, will not renew at this time.

(*Id.* at 695).  While Ms. Pope may have been frustrated, there were medical reasons and medical questions from an expert oncologist regarding the testing, including whether it would continue to be necessary based upon the prior report.

On May 2, 2018, Dr. Lacy met with Ms. Pope to further discuss and explain the Colaris and Lynch testing and informed her of the medical basis of why it had not been approved:  "she was informed that the Colaris was not approved because after reviewing her pathology report the Corizon oncologist concluded that she has Lynch Syndrome and does not need another test for it…I told her I would discuss it further with her local oncologist." (*Id.* at 705).   On May 16, 2018, PA Rohrs documented udpates regarding the Colaris testing, noting:

> Received email and spoke with REgional Medical Director. RMD and this MP had met with the patient regarding the need for Colaris testing. RMD spoke to the Offsite Oncologist (Dr. Trimble) and also spoke with the Corizon Oncologist (this was a second discussion with Corizon Oncologist) regarding Colaris testing. The Corizon Oncologist reviewed the patient's information again and, "Reconsideration
> Patient is + for mutation in tumor for MSH-6 I agree with need for germ line testing (colaris) for lynch syndrome in patients < age 50, even if family pedigree is negative" Due to this the RMD requested this MP to submit another 407 for the testing noting that the Corizon Oncologist now agrees. Done today.
>
> Appt. scheduled with pt next week to discuss an also to complete additional 407's (see paper chart).

(*Id.* at 707).   On May 16, 2018, PA Rohrs submitted another request for Colaris testing, this time updating that the "Corizon oncologist who initially thought testing was not necessary has now reconsidered and is recommending testing." She further advised of the Corizon oncologist's updated findings. (*Id.* at 711-712). With this updated information, Dr. Papendick approved the request two days later. (*Id.* at 711-712). The blood specimen was obtained on 5/29/2018 and on 6/13/2018 was reported as positive for Lynch Syndrome (*Id.* at 770).

On May 21, 2018, Dr. Pei reviewed Ms. Pope's chart and documented that she would be scheduling a colonoscopy for July 2018, and an oncology follow-up in three months, and would discuss with Pope at next visit. (*Id.* at 713) On May 29,

2018, Dr. Papendick approved the colonoscopy request and CT scans, but noted that "follow-up for surveillance is to be completed onsite utilizing NCCN guidelines." (*Id.* at 735-736, 740-741).  However, at that time, Dr. Papendick did not approve the additional ooncology and noted that "surveillance is to be completed on site by MSP." (*Id.* at 733-734).[3]  On May 22, 2018, PA Rohrs had an office visit with Ms. Pope and explained her efforts to obtain the genetic testing. (*Id.* at 727-729).

The above medical timeline demonstrates continuous and proper medical treatment, along with the exercise of proper medical judgment, in an attempt to diagnose and treat her medical conditions, including her colon cancer.  During the remainder of Ms. Pope's incarceration, and contrary to her argument that she did not receive proper treatment for her colon cancer, her treatment further includes follow up exams with Dr. Azimi and PA Rohrs who attempted to continue treating her, CT scans, urology and oncology visits, a colonoscopy and a host of other objective tests and exams demonstrating no malignancies.  <u>The diagnosis and treatment of her colon cancer was successful, her surgery was successful, and she is now cancer free with less than a five percent (5%) chance of having any relapse or reoccurrence of colon cancer.</u>  (See **Ex C**, Dr. Appel Expert Report, Chief of Hematology and Oncology at DMC Hospital).  Plaintiff has no medical expert to say otherwise. Her expert

---

[3] She ended up having an oncology visit on October 17, 2018 demonstrating no issues.  (**Ex A**, at 894-896, 1021-1024)

disclosures and reports deadlines have long since passed per **ECF No. 87, PageID.951**). Ms. Pope's most recent record of February 2021 shows no recurrence of colon cancer. (**Ex D**). Both Dr. Fowlkes and Dr. Appel are wholly supportive that the herein Defendants provided proper care, that there was no delay in diagnosis, and that Plaintiff suffered no damages from any alleged actions/inactions by the herein Defendants. Plaintiff has retained no medical experts to say otherwise. See also the Affidavits of the herein Defendants supporting their treatment, decisions, and medical judgments in this matter. (**Exhibits E-I**).

## II. LEGAL STANDARD

Under Fed. R. Civ. P. 56, summary judgment is proper if the moving party demonstrates there is no genuine issue as to any material fact. The Supreme Court has interpreted this to mean that summary judgment is appropriate if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).

In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986). However, a party opposing a motion for summary judgment must do more than simply show that there is some metaphysical doubt as to the

material facts. *Scott v. Harris*, 550 U.S. 372, 380 (2007). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Id*. (quotations and citation omitted). Similarly, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.*

### III. LEGAL ARGUMENT

**A. There Is No Genuine Dispute That The Defendants' Actions Did Not Constitute Deliberate Indifference.**

The U.S. Supreme Court holds that deliberate indifference to the serious medical needs of a prisoner constitutes "unnecessary and wanton infliction of pain" and therefore violates the Eighth Amendment. *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). However, an action under the Eighth Amendment does not transform medical malpractice claims into constitutional violations "merely because the victim is a prisoner." *Id*. at 106. Rather, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Id*. To prevail on a claim of deliberate indifference, a plaintiff must satisfy objective and subjective components. *Farmer v. Brennen*, 511 U.S. 825, 834 (1994). The objective component requires the existence of a "sufficiently serious" medical need, while the subjective component requires that

18

prison officials had "a sufficiently culpable state of mind in denying medical care." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 895 (6th Cir. 2004). To satisfy the objective component, an inmate's "sufficiently serious" medical need must be a condition "diagnosed by a physician as mandating treatment," or "so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Blackmore v. Kalamazoo Cty.*, 390 F.3d 890, 897 (6th Cir. 2004).

To satisfy the subjective component, a plaintiff must prove that the Defendants "subjectively perceived facts from which to infer substantial risk to the prisoner, that he did in fact draw the inference, and that he then disregarded that risk" by failing to take reasonable measures to abate it. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001) (citing *Farmer*, 511 U.S. at 837). A healthcare professional exercising medical judgment to determine what treatment is needed for a patient is not unconstitutional or illegal. A deliberate indifference claim is a more "stringent standard" than a traditional medical malpractice claim and the "misdiagnosis of an ailment" is insufficient to establish deliberate indifference. *Comstock v. McCrary*, 273 F.3d 693, 703 (6th Cir. 2001). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake v. Lucas*, 537 F.2d 857, n.5 (6th Cir. 1976). The law holds that, so long as a Defendant provided medical treatment,

"albeit carelessly or inefficaciously to a prisoner, he has not displayed a deliberate indifference to the prisoner's needs." *Comstock, supra*. The reasoning for the "subjectively perceived" standard and requirement is:

> *Why is it necessary that a medical professional subjectively perceive facts from which to infer a substantial risk of harm, and then also draw that inference*? <u>Because a medical professional who assesses patient's condition and takes steps to provide medical care, based upon the condition the professional has perceived, is not acting with indifference.</u> Even if the professional's assessment is ultimately incorrect, <u>the professional acted to provide medical care.</u>

*Blaine v. Louisville Metro. Gov't*, 768 Fed. Appx. 515, 526 (6th Cir. 2019) (emphasis added).

### 1. <u>Plaintiff Cannot Satisfy The Objective Component</u>

Here, Defendants do not dispute that Ms. Pope was ultimately diagnosed with colon cancer.  This diagnosis occurred on July 5, 2017, after a colonoscopy in response to her complaints of repeated blood in her stool a few weeks prior. However, from February 18, 2016, Plaintiff's complaints and medical issues primarily concerned managing her anemia, for which she provided a preexisting history, and which required medical treatment.  In Defendants' medical judgment, this accounted for Ms. Pope's complaints and symptoms.  Furthermore, there is no evidence or testimony that her medical complaints and symptoms were the result of colon cancer in 2016 as opposed to her other medical conditions for which she was being treated.  Therefore, prior to July 15, 2017, it was not known that she had colon cancer or was developing colon cancer.   Moreover, for all relevant time frames, to

the extent that Plaintiff contends that she had a serious medical need requiring treatment and that the treatment she received was inadequate and/or delayed, she must demonstrate resulting harm. *Blackmore v. Kalamazoo Cty.*, 390 F.3d at 898, citing *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).  The only medical experts in this case have both opined:

> Ms. Pope had a history of chronic anemia. Her mild to moderate anemia was treated appropriately. She was seen by both primary care and gyn providers. She had no signs or symptoms of gastrointestinal (GI) bleeding. Her hemoglobin level improved with iron supplementation. Ms. Pope was not completely compliant with her iron prescription. The standard of care would not require any additional diagnostic workup, referral or treatment based upon these findings.
>
> * * *
>
> When Ms. Pope developed signs/symptoms of potential GI bleeding in mid-May 2017, she was promptly referred for colonoscopy. This referral was appropriate.
>
> * * *
>
> Given Ms. Pope's long history of chronic anemia, her sex and age, her report of a negative fecal occult blood test and the moderate level of her hemoglobin decrease, the most likely cause of her anemia would be iron deficiency…The medical providers appropriately provided her iron supplementation and followed her hemoglobin serially with a good response to iron replacement.
>
> * * *
>
> In the records I have reviewed Ms. Pope did not have signs of GI bleeding or other gastrointestinal symptoms prior to March 2017. She was less than 50 years old and did not have a known history or family history of Lynch Syndrome or any other family history of a genetic disorder. Thus, she did not meet the criteria for routine colorectal cancer screening. (**Ex B**, Dr. Fowlkes Expert Report, pgs. 28 and 31)
>
> * * *
>
> "The treatment provided by the Corizon Defendants was appropriate and within the standard of care," and "[had] she been diagnosed in 2016 she would have most likely required a hemicolectomy. Therefore, there was no change in management or

21

outcome as a result of any alleged delay in diagnosis." (**Ex C**, Dr. Appel Report, pgs. 3-4).

Therefore, based upon the evidence, the only serious medical condition known to the Defendants was the anemia condition that they were already treating.

Since Plaintiff cannot show, and the medical evidence does not demonstrate, that (1) she required treatment for colon cancer prior to May 2017, and (2) the alleged delayed diagnosis or inadequate treatment caused her harm, Plaintiff's deliberate indifference claim fails as to establish the objective component.

## 2. <u>Plaintiff Cannot Satisfy The Subjective Component</u>

The Court must analyze the subjective component of a deliberate-indifference claim "for each [Defendant] individually." *Garretson v. City of Madison Heights*, 407 F.3d 789, 797 (6th Cir. 2005); *see Gibson v. Matthews*, 926 F.2d 532, 535 (6th Cir. 1991).

## <u>Dr. Azimi:</u>

Because Dr. Azimi appropriately assessed Plaintiff and provided reasonable treatment during his involvement and exercised his medical judgment, Plaintiff cannot demonstrate the subjective component of his deliberate indifference claim against him. It is undisputed that when Dr. Azimi was asked by the prison psychiatrist to see Ms. Pope due to anemia concerns, he conducted a history, a gynecological exam, found no abdominal pain, black stools, diarrhea, jaundice, or weight loss, and referred her to Dr. Pei for anemia management. He also conducted

22

a rectal exam which was negative, provided hormone replacement therapy, and ordered and reviewed numerous labs concerning her hemoglobin levels. He also requested a pelvic ultrasound which led to the diagnosis of uterine fibroids. After she was diagnosed with colon cancer, and to further assess her condition, he performed an endometrial biopsy which was negative. These actions were all in response to Ms. Pope's complaints and symptoms and demonstrate that he did not ignore Ms. Pope's medical needs.

**Dr. Pei:**

Dr. Pei began seeing Plaintiff in response to Dr.Azimi's request to evaluate and treat her anemia. Dr. Pei obtained a thorough medical history and also initially noted abdominal pain, black stools, bone pain, brittle nails, chest pain, constipation, fatigue, joint pain, low blood pressure, syncope, tachycardia, nor vomiting. She sought a diagnosis and attempted to rule out the conditions she believed might be causing Plaintiff's symptoms. She screened for autoimmune diseases, provided allergy treatment, iron tablets for anemia, anti-constipation medications when concerns were present, ordered Zantac medication, ordered a special pillow to help prevent GERD, ordered and reviewed labs, ordered x-rays, continuously monitored hemoglobin levels, recommended special diets that might address the symptoms, and ordered pain medications post cancer diagnosis. She also reviewed and requested that the surgeon's recommendations be considered for Plaintiff's care,

including the carcinoembryonic antigen (CEA) level testing, oncology follow-ups, CT scans, and a subsequent colonoscopy.

**Dr. Gopal:**

It was Dr. Gopal who was treating Plaintiff when she began repeated complaints of blood in her stool.  He attempted to place her in the infirmary for continued monitoring and so that any symptoms could be promptly addressed.  He also ordered and reviewed her labs and hemoglobin levels.   He prescribed a wheelchair for Ms. Pope and prescribed pain medication, including the morphine release.   He submitted the 407 request for the colonoscopy (which was approved and diagnosed colon cancer), and also submitted the 407 request for a surgical referral (which was approved and treated and cured her cancer).  He also submitted the 407 requests for Ms. Pope's presurgical work-up, including the nuclear stress test (which was also approved and ultimately led to her being cleared for surgery).

**Dr. Papendick:**

Dr. Papendick, as utilization manager, approved nearly all of the things (407s) requested on Plaintiff's behalf on the first request.  And he ultimately approved the Colaris/Lynch testing once the ACMO, RMD, and the Corizon expert oncologist and the treating oncologist were all in agreement as to why it was medically necessary and clarified discrepancies in light of the prior biopsies.  He approved Ms. Pope's pelvic ultrasound, colonoscopy, surgical referral, CT scans and cardiac consult,

24

nuclear stress test, post-surgical follow-up appointment, oncology consult, and post-surgical colonoscopy and CT scans. And, as the records demonstrate, any delay or clarification required for the Colaris/Lynch testing was not attributed to Dr. Papendick.

**PA Rohrs:**

Plaintiff began seeing PA Rohrs on December 22, 2017, post-hemicolectomy surgery. PA Rohrs reviewed and processed the recommendations of the surgeon, including CEA testing, follow-up appointments, and Colaris/Lynch testing.  She also made it possible for Ms. Pope to receive her morphine medication in the afternoon and evening, obtaining a special accommodation from the MDOC staff. She provided office visits, worked closely with the ACMO to obtain special accommodations such as the Colaris/Testing, saw that a Lynch testing kit was ordered by the nursing staff, made a dietician referral, and submitted the 407 requests for the Colaris/Lynch testing which was ultimately approved once the ACMO, RMD, and the Corizon expert oncologist and the treating oncologist were all in agreement as to why it was medically necessary and clarified discrepancies in light of the prior biopsies. The records demonstrate, any delay or clarification required for the Colaris/Lynch testing was not attributed to P.A. Rohrs. She also submitted a 407 for additional thyroid tests and requested another oncology follow-up because

of Ms. Pope's abdominal pain and elevated CEA shown on recent tests, which were both approved.

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis or treatment are not enough to state a deliberate indifference claim. *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976). Courts typically do not intervene in questions of medical judgment. *Youngberg v. Romeo*, 457 U.S. 307, 321 (1982). "Where a prisoner has received some medical attention and the dispute is over the adequacy of the treatment, federal courts are generally reluctant to second guess medical judgments and to constitutionalize claims which sound in state tort law." *Westlake*, 537 F.2d 857 at n.5. Nor does an alleged "**misdiagnosis** of an ailment" constitute deliberate indifference. *Johnson v. Karnes*, 398 F.3d 868, 875 (6th Cir. 2005).

In this case, **Plaintiff did not simply receive *"some"* medical treatment; instead, she received an *abundance* of medical treatment**. Plaintiff simply cannot show that Dr. Azimi, Dr. Pei, Dr. Gopal, Dr. Papendick, nor PA Rohrs "subjectively perceived" (and consciously disregarded) facts from which to infer substantial risk" to Plaintiff, particularly where they attempted to treat, and did treat, her conditions for which she presented to them **continuously** from March 7, 2016, through the time of her discharge from the MDOC.

26

Not only did all of these doctors provide treatment, but they were also utilizing their medical judgment in treating Plaintiff (**Exhibit E through I**).

### B. Summary Disposition Is Proper Here Since Plaintiff Has No Requisite Expert Testimony To Support Deliberate Indifference Or Damages.

In *Phillips v. Tangilag*, 14 F. 4th 524 (6th Cir. 2021), the Sixth Circuit was tasked with determining whether medical expert testimony is required to establish the objective component of a deliberate indifference claim based on allegations of inadequate care. Noting that "[e]ven for garden-variety negligence claims, the overwhelming weight of authority supports the view that ordinarily expert evidence is essential to support an action for malpractice against a physician or surgeon," *Id* at 535, the Sixth Circuit reasoned "it would be odd if a prisoner could prove an Eighth Amendment claim more easily than an ordinary individual could prove a malpractice claim." *Id*. Looking to state tort law on the necessity of expert testimony to establish the applicable standard of care, it is easy to see why the *Phillips* Court reached the conclusion it did. As explained in the Michigan medical malpractice case of *Wiley v. Henry Ford Cottage Hosp.*, 257 Mich. App. 488 (2003):

> Expert testimony is necessary to establish the standard of care because the ordinary layperson is not equipped by common knowledge and experience to judge the skill and competence of the service and determine whether it meets the standard of practice in the community.

27

In the same vein, if not more so, an ordinary layperson lacks the knowledge and experience to determine whether the actions of a medical provider treating an inmate **grossly deviated** from **or ignored** the care that would be provided by a reasonably prudent physician. Accordingly, the *Phillips* Court held that when an inmate has received care and is challenging the adequacy of that care under the Eighth Amendment "[o]ur cases require expert testimony for this different type of challenge." *See Phillips*, 15 F 4th at 537 (6h Cir. 2021); citing *Blackmore v. Kalamazoo County*, 390 F.3d 890, 899 (6th Cir. 2004); *Anthony v. Swanson*, 701 Fed. Appx. 460 (6th Cir. 2017).  Here, Plaintiff has no experts to support her claim. Moreover, she has no expert testimony to refute the testimony of Defendants' correctional medicine expert, Dr. Fowlkes, nor oncology expert, Dr. Pope.

In order for Plaintiff to prove her case, not only would expert testimony be required to establish the appropriate course of treatment and that Defendants' treatment was somehow indifferent, she would also need to establish that a delay in not receiving a certain type of treatment somehow resulted in a serious medical injury and caused and/or worsened her colon cancer condition.  *Blackmore v. Kalamazoo Cty.*, 390 F.3d at 898, citing *Napier v. Madison County*, 238 F.3d 739, 742 (6th Cir. 2001).  Here, Plaintiff has no such evidence or expert testimony. (See **Ex C**, pgs. 3-4, and **Ex B**, pgs. 28-32).  As both expert reports and the medical records demonstrate, colon cancer and its diagnosis and treatment, genetic Lynch

testing and biopsies, along with the type of cancer that Plaintiff acquired, are extremely complex areas of medicine.  Plaintiff cannot support these claims and summary judgment is proper.

## IV. <u>RELIEF REQUESTED</u>

WHEREFORE, Defendants KEITH PAPENDICK, M.D.; CLAIRE PEI, M.D.; MOHAMMED AZIMI, M.D.; SHANTI GOPAL, M.D.; AND DONNA ROHRS, P.A. respectfully request that this Honorable Court grant Defendants Motion for Summary Judgment and provide any and all further relief that this Court deems just and equitable.

Respectfully submitted,
CHAPMAN LAW GROUP

Dated: September 9, 2022        /s/Devlin K. Scarber
Devlin Scarber (P64532)
Jeffrey L. Bomber (P85407)
Attorneys for Keith Papendick, M.D.;
Claire Pei, M.D.; Mohammed Azimi, M.D.;
Shanti Gopal, M.D.; and Donna Rohrs, P.A.
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com
jbomber@chapmanlawgroup.com

## **LOCAL RULE CERTIFICATION**

I, DEVLIN K. SCARBER, certify that this document complies with Local Rule

5.1(a), including: double-spaced (except for quoted materials and footnotes); at least

one-inch margins on the top, sides, and bottom; consecutive page numbering; and

type size of all text and footnotes that is no smaller than 10-1/2 characters per inch

(for non-proportional fonts) or 14 point (for proportional fonts). I also certify that it

is the appropriate length. Local Rule 7.1(d)(3)

/s/Devlin K. Scarber
Devlin K. Scarber (P64532)
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com

## **PROOF OF SERVICE**

I hereby certify that on September 9, 2022, I presented the
foregoing paper to the Clerk of the Court for filing and uploading
to the ECF system, which will send notification of such filing to
the attorneys of record listed herein and I hereby certify that I
have mailed by US Postal Service the document to the involved
non participants.

/s/Devlin K. Scarber
Devlin K. Scarber (P64532)
1441 West Long Lake Rd., Suite 310
Troy, MI 48098
(248) 644-6326
dscarber@chapmanlawgroup.com