UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

AISHA POPE,

                            Plaintiff,                Civil Action No. 19-10870

                                                      David M. Lawson
v.                                                    United States District Judge

CORIZON HEALTH, INC., *et al.*,                       David R. Grand
                                                      United States Magistrate Judge
                            Defendants.
_____/

## REPORT AND RECOMMENDATION TO GRANT DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF No. 131)

On March 25, 2019, *pro se* plaintiff Aisha Pope ("Pope"), an inmate of the Michigan Department of Corrections' ("MDOC") Women's Huron Valley Correctional Facility ("WHV"), filed this civil rights action pursuant to 42 U.S.C. § 1983 against several MDOC and Corizon Health ("Corizon") employees. On May 21, 2019, the Honorable David M. Lawson issued an Opinion and Order dismissing several MDOC defendants. (ECF No. 7). Following Corizon's bankruptcy, and pursuant to a stipulation by plaintiff and the Corizon defendants (ECF No. 133), on July 10, 2025, Judge Lawson entered an Order dismissing without prejudice Pope's claims against the Corizon employees. (ECF No. 134). The remaining three defendants are MDOC-employed registered nurses ("RN"), Krystin Fiorini ("Fiorini"), Janet Branch ("Branch"), and Bryant Tinsley ("Tinsley") (collectively, "Defendants").[1]

_____

[1] On June 2, 2020, an Order of Reference was entered, referring all pretrial matters to the

Now pending before the Court is a Renewed Motion for Summary Judgment, which has been fully briefed.  (ECF Nos. 131, 137, 138).[2]

## I.    RECOMMENDATION

For the reasons set forth below, **IT IS RECOMMENDED** that Defendants' Renewed Motion for Summary Judgment **(ECF No. 131)** be **GRANTED.**

## II.   REPORT

### A.    Background

Pope, a State of Michigan prisoner, brings this civil rights action pursuant to 42 U.S.C. § 1983.  She claims that the Defendants were deliberately indifferent to her serious medical needs in the months leading up to her cancer diagnosis, in violation of her Eighth Amendment rights against cruel and unusual punishment.   (ECF No. 131).   More specifically, Pope alleges that Defendants "participated in delaying and denying plaintiff care that could have prevented the [colon cancer]" she was diagnosed with, and that "[t]he

---

undersigned pursuant to 28 U.S.C. § 636(b). (ECF No. 52).

[2] The Defendants had filed a summary judgment motion on September 9, 2022, that was fully briefed by the parties.  (ECF Nos. 88, 93, 99).  The Corizon defendants had also filed a summary judgment motion that was fully briefed.  (ECF Nos. 90, 94, 105).  The Court held oral argument on the motions by Zoom on December 7, 2022.  Before the Court could issue its rulings, however, Corizon filed a bankruptcy petition and an automatic stay took effect, which was later extended by the Court.  (ECF No. 116).  On January 17, 2024, pursuant to the parties' stipulation, the Court entered an Order dismissing the then pending summary judgment motions without prejudice to being renewed after the stay had been lifted.  (ECF No. 125).  On May 8, 2025, the Court held a telephonic status conference with counsel to the parties during which counsel to Pope and the Corizon defendants agreed that "in light of the Corizon bankruptcy case resolution, plaintiff's claims against those defendants are no longer properly litigated in this action."  (*See* May 8, 2025 text entry).  Thus, as noted above, Pope and the Corizon defendants stipulated to the dismissal of her claims against them (ECF Nos. 133, 134), and only the Defendants renewed their prior summary judgment motion.

defendants['] deliberate indifference made conditions worse, causing new medical problems." (ECF No. 1, PageID.4).

Pope's claims arise from several occasions when she complained to Defendants of blood in her stool, chest pain, and stomach pain. The timeline of salient events is fairly cabined. They begin on May 25, 2017, when Dr. Shanti Gopal met with Pope and ordered a colonoscopy to investigate the cause of her symptoms. (ECF No. 88-2, PageID.1024-26, 1030, 1037-38). About six weeks later, on July 5, 2017, Pope had the colonoscopy, which led to her cancer diagnosis on July 18, 2017, and a surgery to remove it on November 22, 2017. (ECF No. 1, PageID.11; ECF No. 88-2, PageID.1224-24, 1230, 1509, 1659, 1862). Pope's last relevant medical treatment was on May 31, 2018, when she went to the hospital and was treated for an "upper respiratory infection and lesions on [her] lungs." (ECF No. 1, PageID.20). Although Pope received much treatment in the 12 months at issue, her claims against the Defendants relate to her interactions with them on the following specific dates, which the Court will discuss in detail below as part of its discussion of the medical records in this case:

> • RN Fiorini on June 6, 2017, and May 31, 2018 (*id*. at PageID.9, ¶22 and PageID.19, ¶88);

> • RN Branch on June 7, June 25, and August 23 of 2017 (*id*. at PageID.9-10, ¶24; PageID.11, ¶33; and PageID.13, ¶49); and

> • RN Tinsley on June 13, 2017. (*id*. at PageID.10, ¶¶26-27).

On June 6, 2017, Pope contacted RN Fiorini at 4:00 a.m. and advised that she "was having chest pain and my stomach was hurting severly [sic] and it woke me up out my sleep." (ECF No. 1, PageID.9; ECF No. 88-2, PageID.1043). RN Fiorini told Pope that

3

the stomach pain was probably heartburn and to call back if she didn't feel any better. (ECF No. 1, PageID.9).  Pope told RN Fiorini that she "had not eaten anything that would make me feel like this and I truely [sic] think it was something a little more serious."  (*Id.*). Pope alleges that about a half hour later she found blood in her stool and called RN Fiorini back.  (*Id.*).  A second call is not reported in Pope's medical record.  (ECF No. 88-2, PageID.1043).  Regardless, during either the first or second call, Pope told RN Fiorini "that she is already being treated for blood in her stool."  (*Id.*).  At this time, a colonoscopy request related to these same symptoms had already been approved, and  RN Fiorini told Pope that she would not see her for the blood in her stool, but Pope could come to healthcare for an assessment.  (*Id.*; ECF No. 1, PageID.9).  Pope responded that she did not want to pay the $5 copay, and did not go to healthcare.  ( ECF No. 1, PageID.9).

Later that day, RN Tinsley received a call about Pope "lying outside on the ground," and he made sure that "Health Care Staff" were "enroute" to assist.  (ECF No. 88-2, PageID.1045).   Tinsley examined Pope and took her vitals, finding her in "no acute distress."  (*Id.*, PageID.1048-50).  He also issued Pope medical "details," indicating that she was approved for "[l]ay in to bunk," to eat her meals in her cell, and be given clear liquids throughout the day.  (*Id.*, PageID.1046).

The next day, on June 7, 2017, Pope told correctional officers about the bleeding from her rectum, and the chest and abdominal pain, and the officers reported it to healthcare.  (ECF No. 1, PageID.9-10).  Pope alleges that in response, "R.n Branch said to drink water and to kite h/c by mail."  (ECF No. 1, PageID.10).  While there are no entries in Pope's medical record from June 7th, Pope did send a kite to healthcare that day,

4

however, it was regarding a dental filling that had fallen out.   (ECF No. 88-2, PageID.1051).  Later that afternoon, Pope had a lab study done.  (*Id.*, PageID.1052-53).

Pope alleges in her complaint that "[o]n or about 6/7 to 6/13/2017 I remained untreated and was not taken seriously about my issues." (ECF No. 1, PageID.10).  On June 11, 2017, at 8:30 p.m. Pope contacted RN Fiorini, complaining about "hot flashes [], fever, bruising on my body and still bleeding from my rectum," and RN Fiorini responded, "You will be scheduled to see the RN[.] Please watch your callout for exact date and time."  (ECF No. 88-2, PageID.1054).  On June 13, 2017, Pope spoke with RN Tinsley over the phone about her health concerns.  She told him "that i was still dropping clots from my rectum and also liquid blood." (ECF No. 1, PageID.10).  According to Pope, RN Tinsley told her that she was already being treated for those complaints, she gets her blood drawn every two weeks, and that healthcare doesn't do preventative care.  (*Id.*).  According to RN Tinsley's notes from the call, RN Tinsley also told Pope that she had an upcoming healthcare appointment, and a "pending appointment for a colonoscopy." (ECF No. 88-2, PageID.1055-56).  RN Tinsley also reviewed Pope's lab results from June 7, 2017, and found "no critical results present."  (*Id.*).  Although RN Tinsley told Pope that she was already being treated for blood in her stool, Pope responded that she wasn't being treated, and "things were getting worse and I was experiencing worser [sic] pain." (ECF No. 1, PageID.10).

Pope alleges that she collapsed later on June 13th and was taken to healthcare.  (ECF No. 1, PageID.10).  Records reflect that Pope was "seen following phone call regarding c/o 'abdominal pain, shortness of breath and hot flashes," making no mention of Pope having

"collapsed," and RN Tinsley assessed Pope, taking her vitals and doing a physical examination.  (ECF No. 88-2, PageID.1057-58).  RN Tinsley found "no acute distress," that her breathing was "even and unlabored," and that her abdomen was "soft and non-distended," but he admitted her to the infirmary, and notified Dr. Gopal, the medical provider.  (*Id.*).  According to Pope, RN Tinsley said that "he could give me something for unset [sic] stomach and gave me mylax and had me sit in pain for almost 2hr and sent me back to my unit."  (ECF No. 1, PageID.10).[3]

On June 22, 2017, Dr. Gopal evaluated Pope and did an x-ray of her abdomen.  (ECF No. 1, PageID.11).  Pope alleges that on June 25, 2017, she:

> reported the continuing bleeding and chest pain to R.n James and he started laughing and saying it was stress and asked R.n Branch if i was experiencing pain that traveled down from my chest throgh [sic] to my left arm and she agreed that it was stress and neither of them took my vitals and said I was a drama queen and when they took my vitals my bloodpressure [sic] was very high, and they did nothing.

(ECF No. 1, PageID.11; ECF No. 88-2, PageID.1147).  RN Branch wrote in the treatment note that day: "[Pope] observed ambulating in hallway independently.  A&O x 3, all VSS, denies c/o pain or discomfort.  No medical complaints/concerns voiced at this time."  (ECF No. 88-2, PageID.1148).  RN Branch recorded Pope's vital signs, including temperature,

---

[3] Pope asserts in her complaint that RN Tinsley "sent me back to my unit" on June 13, 2017.  (ECF No. 1, PageID.10).  The medical records, however, indicate that Pope was under inpatient care at that time.  At 12:40 pm that day, RN Tinsley wrote in Pope's medical record, "Medical Provider notified of assessment.  Order rec'd to admit Inmate to Infirmary."  (ECF No. 88-2, PageID.1060).  At 9:19 pm, he wrote, "Inmate admitted to the Infirmary with retal [sic] bleeding and abdominal pain."  (*Id.*, PageID.1060).  In her medical record, Pope has inpatient nursing treatment records completed daily from June 13, 2017, to July 9, 2017, which indicate that Pope remained in the infirmary during this time, or at least under its close observation.  (ECF No. 88-2, PageID.1060-1207).  Importantly, even if Pope was in her unit and not in the infirmary during this time, her medical record reflects virtually daily evaluations by healthcare.  (*Id.*).

respiration rate, blood pressure, and pulse.  (*Id.*).

On July 5, 2017, Pope had the scheduled colonoscopy, which led to her cancer diagnosis less than two weeks later on July 18, 2017.  (ECF No. 1, PageID.11; ECF No. 88-2, PageID.1230, 1659, 1862).  After the colonoscopy, Pope was returned to the WHV infirmary, where she remained until being discharged – at her request – on July 10, 2017. (ECF No. 88-2, PageID.1187, 1210-11.)  That same day, the hospital that performed Pope's colonoscopy provided the MDOC with the pathology report, which showed "invasive moderately differentiated adenocarcinoma" and recommended "consultation with surgeon for resection." (*Id.*, PageID.1214).  Dr. Gopal scheduled Pope for a follow-up appointment and referred Pope to a surgeon.  (*Id.*, PageID.1214-18).  The request for surgical referral was approved two days later, and the surgery was performed on November 22, 2017. (*Id.*, PageID.1224-25, 1509).

Pope makes one allegation of wrongdoing that occurred between the scheduling of her surgery and the surgery itself.  First, she alleges that RN Branch was deliberately indifferent on August 23, 2017, based on the following events:

> On or about 8/23/2017, after months (4/2017) or [sic] requesting to see Dr. Azimi for my ultrasound results and discuss the persistent pain in my tummy and lower abdomen.
>
> On or about 8/23/2017 I had a [sic] appt and missed it because of the policy on the walks opening.
>
> On or about [sic] I had c/o tharpe call h/c to report I was experiencing heavyblood [sic] in my stool and she spoke to R.n Branch and the nurse said there was no need for me to come there and there was no need to get my vital checked and to kite h/c the call was 10am. I was gassy, tummy hurt, smelly bowel. R/n Branch refuse [sic] to talk to me which is not against policy

but spoke through the officer and c/o put it in the logbook.

(ECF No. 1, PageID.13).

Pope claims that over about the next week, she "experienced the worst pain [sic] and cramping of my life." (*Id.*, PageID.14). Records from this same day, however, reveal that Dr. Gopal discontinued Pope's Tylenol #3 prescription because Pope was "allergic to tylenol [sic]." (ECF No. 88-2, PageID.1354). She saw another doctor that same day for "pelvic results." (*Id.*, PageID.1358). The next day a "Chart Review/Update" was ordered because Pope's Tylenol was discontinued. (*Id.*, PageID.1361). Three days later, on August 28, 2017, Pope was prescribed a different pain medication. (*Id.*, PageID.1364).

For the next nine months, Pope describes undergoing different medical treatments and procedures, as well as continuing to suffer from rectal bleeding and pain, and makes a number of accusations against the Corizon defendants. (*Id.*, PageID.14-19). However, she does not accuse the MDOC Defendants of any wrongdoing during that timeframe. Rather, Pope's last allegation of wrongdoing by any of them relates to an interaction she had with R.N. Fiorini on May 31, 2018. Specifically, Pope alleges, "I was being assess [sic] for coughing up blood and chest pain and R.N [F]iorini [sic] interfered with another nurses [sic] assessment to avoid her duties as anurse [sic] and report my condition to the on call doctor." (ECF No. 1, PageID.19). According to her medical records, Pope was treated on May 31, 2018, by RN Floyd, who is not a defendant in this case, for "spitting up 2 bloody mucous plugs." (ECF No. 88-9, PageID.1832). RN Floyd notified Dr. Pei and, per Dr. Pei's instruction, sent Pope to the hospital that night. (ECF No. 88-9, PageID.1832). Pope admits that she went to the hospital and was treated for an "upper respiratory infection and

8

lesions on [her] lungs."  (ECF No. 1, PageID.20).

Pope was paroled from MDOC custody in October 2020. (ECF No. 88-6, PageID.1760-61).  As of her deposition in May 2022, she was still seeing a doctor every six months, and her cancer was in remission.  (*Id*. at 1776-77).

In Defendants' motion for summary judgment they concede that colon cancer is a serious medical condition but point out that Pope "was receiving on-going and frequent medical treatment."  (*Id.*).   Defendants argue that they "acted within the scope of their practice and provided Pope care when needed" and that Pope does not provide evidence that her "doctors were grossly incompetent."  (ECF No. 88, PageID.972, 978).  (citing *Phillips v. Tangilag*, 14 F.4th 524, 529 (6th Cir. 2021). Pope's response brief discusses the *allegations* in her complaint, but does not reference a single piece of *medical evidence*.[4] (ECF No. 137).  Instead, she makes sweeping conclusory assertions, such as "[t]he basis of Plaintiff's claim was that she constitutionally received inadequate medical care. MDOC Defendants contend that her care was adequate that the MDOC Defendants' action were not deliberately indifferent. Clearly, there is a dispute of facts." (*Id.*, PageID.2551-52).  In the next breath, again without citing any *evidence*, Pope asserts, "[i]t is undisputed that MDOC Defendants' actions caused Plaintiff physical and mental injuries."   (*Id.*, PageID.2553).

For the reasons discussed below, Pope fails to raise a material question of fact to

---

[4] "[U]nsworn allegations in a complaint are not evidence." *Mack v. Bessner*, 512 F. Supp. 3d 784, 792 (E.D. Mich. 2021).  *See also Alzid v. Porter*, No. 23-2098, 2024 WL 4579427, at *5 (6th Cir. Oct. 25, 2024) ("Alzid has not provided anything beyond the allegations in his complaint, which are not evidence….").

survive Defendants' summary judgment motion, and that motion should be granted.

###    B.    Standard of Review

Pursuant to Rule 56, the Court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Pittman v. Cuyahoga Cty. Dep't of Children & Family Servs.*, 640 F.3d 716, 723 (6th Cir. 2011).  A fact is material if it might affect the outcome of the case under governing law.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  In determining whether a genuine issue of material fact exists, the Court assumes the truth of the non-moving party's evidence and construes all reasonable inferences from that evidence in the light most favorable to the non-moving party.  *See Ciminillo v. Streicher*, 434 F.3d 461, 464 (6th Cir. 2006).

The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion and must identify particular portions of the record that demonstrate the absence of a genuine dispute as to any material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Alexander v. CareSource*, 576 F.3d 551, 558 (6th Cir. 2009).  "Once the moving party satisfies its burden, 'the burden shifts to the nonmoving party to set forth specific facts showing a triable issue.'"  *Wrench LLC v. Taco Bell Corp.,* 256 F.3d 446, 453 (6th Cir. 2001) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986)).  In response to a summary judgment motion, the opposing party may not rest on its pleadings, nor "rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact but must make an affirmative showing with proper evidence in order to defeat the motion."  *Alexander*, 576 F.3d at 558 (internal

10

quotations omitted).

    **C.**    **Analysis**

    The Sixth Circuit recently explained the general framework for analyzing deliberate

indifference claims in the prisoner medical care context:

> Prison officials have a duty under the Eighth Amendment to provide medical care, and they violate that duty when they act with deliberate indifference to a prisoner's serious medical needs. *Rhinehart v. Scutt*, 894 F.3d 721, 736 (6th Cir. 2018). A claim of deliberate indifference in this context has both an objective component and a subjective component. *Comstock v. McCrary*, 273 F.3d 693, 702 (6th Cir. 2001). The objective component requires a plaintiff to prove that he has a "sufficiently serious" medical need. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Setter*, 501 U.S. 294, 298 (1991)). When a physician diagnoses a serious medical need, "the plaintiff can establish the objective component by showing that the prison failed to provide treatment." *Rhinehart,* 894 F.3d at 737. But when an inmate is receiving ongoing treatment, he can establish the objective component by showing that the treatment was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Id.* (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 819 (6th Cir. 2005)). The subjective component, on the other hand, requires the plaintiff to show that the defendant knew that he faced "a substantial risk of serious harm and disregard[ed] that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847.

*Johnson v. Austin*, No. 23-2080, 2024 WL 5112912, at *2 (6th Cir. Sept. 17, 2024).

    The Sixth Circuit has additionally held that where ongoing treatment has been

provided:

> The plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment. There must be "medical proof that the provided treatment was not an adequate medical treatment of [the inmate's] condition or pain." [] This will often require "expert medical testimony ... showing the medical necessity for" the desired treatment and "the inadequacy of the treatments" the

> inmate received.  []  The plaintiff also must "place verifying medical
> evidence in the record to establish the detrimental effect" of the
> inadequate treatment.  []

*Rhinehart*, 894 F.3d at 737-38.

Similarly, as the Sixth Circuit explained in *Phillips v. Tangilag*, 14 F.4th 524, 538-39 (6th Cir. 2021), a deliberate indifference claim based on an alleged delay in medical care "typically requires expert testimony," and a plaintiff asserting such a claim must "'place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment.'"  *Phillips*, 14 F.4th at 538-39.

Analyzed against these standards, Pope's deliberate indifference claims are subject to summary judgment.  Most all of the interactions Pope complains about occurred while she was waiting for her colonoscopy that had already been scheduled to address those same complaints.  One occurred while she was waiting for the already-scheduled surgery to take place.  And as to the last one, Pope was sent to the hospital later that same day.  At most, then, Pope's complaints are that the Defendants' alleged inactions should have resulted in moving up her colonoscopy and surgery, or getting her to the hospital sooner.  Indeed, in her summary judgment response brief, Pope asserts that she "suffered medically due to defendants' deliberately indifferent ***delay in treating [her]***."  (ECF No. 137, PageID.2552) (emphasis added).  Under *Rhinehart* and *Phillips*, Pope was required to present evidence showing that the treatment she received was inadequate and/or that any of the delays she complains about caused a "detrimental effect."  As discussed below, she failed to do so.

### 1. *Care between Colonoscopy Being Scheduled and the Colonoscopy*

Pope was approved for a colonoscopy on May 30, 2017, and it was scheduled for

July 5, 2017.  (ECF No. 88-2, PageID.1037-38, 1224).  Most all of the interactions Pope complains about occurred during that short, one month interim period.  But Pope fails to provide any evidence that her condition was worsened by not having the colonoscopy sooner.  She points to no medical evidence and provides no expert testimony that her health outcome would have been different had the colonoscopy been moved up.

Specifically, on June 6, 2017, just one week after Pope was approved for a colonoscopy, she called healthcare and spoke to RN Fiorini, informing her that she "was having chest pain and my stomach was hurting severly [sic]…" (ECF No. 88-2, PageID.1043).  Later she called RN Fiorini after "severly [sic] cramping and sat [sic] on toilet and filled the toilet with a foul liquid blood substance." (*Id.*).  RN Fiorini instructed Pope that she could come to healthcare, but Pope did not do so because she did not want to pay the $5 copay.  (ECF No. 88-2, PageID.1043; ECF No. 1, PageID.9).  As Pope acknowledged to RN Fiorini on the call, she was "already being treated for blood in her stool."  (ECF No. 88-2, PageID.1043).  These were the same symptoms for which Dr. Papendick approved the colonoscopy.  (*Id.*, PageID.1037) ("Signs & Symptoms" listed on May 26, 2017, include "blood in stool for last two weeks… c/o abdominal pain and cramps… She will need a colonoscopy to further evaluate her symptoms.")  Pope provides no evidence that RN Fiorini should have moved up the colonoscopy date or taken any other action in response to her complaints, which were already being addressed by the upcoming colonoscopy appointment.

The following day, on June 7, 2017, two correctional officers called healthcare for Pope because she reported, "I was still bleeding from my rectum and chest was still huring

[sic] and i was still experience [sic] abdominal pain." (ECF No. 1, PageID.9-10). Pope spoke to RN Branch on the phone and RN Branch told Pope to "drink water and to kite h/c by mail." (ECF No. 1, PageID.10, ECF No. 88-6, PageID.1775). These are the same symptoms as RN Fiorini responded to the previous day, and Pope presents no evidence that she was harmed by RN Branch's decision not to take additional actions to move up the colonoscopy date. And, as with the day prior, Pope chose not to kite healthcare for further assistance.

Over the next month, Pope reached out to healthcare again, and during each interaction Defendants reviewed Pope's medical records and/or evaluated Pope in-person. For example, on June 13, 2017, Pope called healthcare to complain about bleeding from her rectum. (ECF No. 88-2, PageID.1055). RN Tinsley reviewed Pope's medical records, saw that she had an upcoming colonoscopy appointment to investigate the cause of the bleeding, reviewed Pope's lab results, and determined that there were "no critical results present." (ECF No. 88-2, PageID.1055). RN Tinsley also noted that Pope had a medical appointment scheduled in three days. (ECF No. 88-2, PageID.1055). RN Tinsley saw Pope a second time that day after Pope allegedly passed out. When Pope was brought to the infirmary, RN Tinsley took Pope's vitals, did a physical examination, and notified Dr. Gopal of the incident and the results of her examination. (ECF No. 88-2, PageID.1058). On June 25, 2017, Pope again reported bleeding from her rectum and chest pain to RN Branch. (ECF No. 1, PageID.11). At this time, Pope was inpatient in the infirmary. (ECF No. 88-10, PageID.1880). Although there is no record of Pope's complaints, RN Branch took Pope's vitals at 9:15 am that day. (ECF No. 88-2, PageID.1148). Pope objects that

14

"when they took my vitals my bloodpressure [sic] was very high, and they did nothing."
(ECF No. 1, PageID.11).

The above interactions relate to treatment Pope received after Dr. Gopal had already scheduled her for a colonoscopy to address the rectal bleeding and other symptoms. Since she had a "medical need diagnosed by a physician as mandating treatment" and was "receiv[ing] ongoing treatment for [her] condition," Pope must make "a showing of care so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable of fundamental fairness." *Rhinehart*, 894 F.3d at 737-38. And "[t]he plaintiff must present enough evidence for a factfinder to evaluate the adequacy of the treatment provided and the severity of the harm caused by the allegedly inadequate treatment." *Id*. Pope was required to at least present some "medical proof that the provided treatment was not an adequate medical treatment of the inmate's condition or pain." *Id.* Pope fails to do so, and, while it is undisputed that Defendants did not take action to move up Pope's colonoscopy date, she provides no evidence that their failure to do so caused her any harm.

Finally, the Court notes that attached as an exhibit to Defendants' motion is the expert report of licensed Registered Nurse Kathryn J. Wild ("Wild"), who has a "degree in Public Administration and Certified as a Corrections Healthcare Professional - RN by the National Commission on Correctional Healthcare (NCCHC) concerning the delivery of specialized nursing care in correctional facilities." RN Wild has worked in the field of Corrections Healthcare for over 35 years as a Registered Nurse and Health Services Administrator responsible for the administration of healthcare, training, and supervision of healthcare employees, as well as the formation and implementation of policy applicable to

staff who provide healthcare to persons housed in corrections facilities." (*Id.*).  Wild avers that "Pope often expressed frustration with the time lapsed to schedule her colon surgery, but the staff at MDOC were working closely with her surgical team and following their direction to ensure that Pope was physically stable to undergo this major surgical procedure." (*Id.*, PageID.1881).  Pope does not contest Wild's medical testimony with any expert testimony of her own nor does she present evidence showing that she "suffered medically due to defendants' deliberately indifferent ***delay in treating [her]***."  (ECF No. 137, PageID.2552) (emphasis added).  Therefore, Pope failed to raise a material question of fact as to whether the care she received between the time she was scheduled for a colonoscopy and when she had the colonoscopy was inadequate under the Eighth Amendment.  *Rhinehart*, 894 F.3d at 737-38; *Phillips*, 14 F. 4th at 529.

### 2.  Care on August 23, 2017

Pope also challenges the care she received on August 23, 2017, which was about a month after her cancer diagnosis and three months before her surgery on November 22, 2017.  Specifically, in her complaint, Pope alleges:

> I had c/o Tharpe call h/c to report that I was experiencing heavyblood [sic] in my stool and she spoke to R.n Branch and the nurse said there was no need for me to come there and there was no need to get my vital checked and to kite h/c the call was 10am.  I was gassy, tummy hurt, smelly bowel.  R.n Branch refuse to talk to me which is not against policy but spoke through the office and c/o put it in the logbook.

(ECF No. 1, PageID.13).  RN Branch recalled about the incident, "If Pope complained to me about bloody stool, I would encourage her to stay hydrated and kite healthcare if the problem persisted.  Because of Pope's colon cancer diagnosis, blood in the stool would not

16

be uncommon."  (ECF No. 88-8, PageID.1827).

During this period of time, Pope was under consistent evaluation by a team of medical professionals.  On August 22, 2017, Pope had an appointment with Dr. Gopal for upper right quadrant pain.  (ECF No. 88-2, PageID.1356).  On August 23, 2017, Pope had an OBGYN medical appointment in the afternoon that she didn't show up to and which was rescheduled.  (ECF No. 88-2, PageID.1357).  Although Pope alleges that she had a valid excuse for missing the appointment, the fact that the appointment was scheduled is evidence of the consistent medical attention she was provided during the time in question.  (ECF No. 1, PageID.13).  And, on August 25, 2017, Pope had her blood drawn for a test.  (*Id.*, PageID.1363).

Pope provides no evidence that RN Branch's care was inadequate, let alone that it caused her harm.  Dr. Papendick had already approved a general surgery consult on July 12, 2017.  (ECF No. 88-2, PageID.1225).  There is no evidence that Pope's condition was made worse by the date of her surgery being in November 2017, rather than sooner.  As RN Branch recalls, "[b]ecause of Pope's colon cancer diagnosis, blood in the stool would not be uncommon."  (ECF No.88-8, PageID.1827).  Pope provides no evidence to contradict that statement.  Although her symptoms were not responded to in the manner Pope would have liked, given her ongoing care and scheduled surgery, the Court does not find evidence to support that Defendants' care of her colon cancer during the brief period in question was "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness."  *Rhinehart,* 894 F.3d at 737.  In the context of her ongoing treatment of colon cancer, which shows regular visits and

examinations, Pope failed to raise a material question of fact that RN Branch was deliberately indifferent to her medical complaints.

### 3. *Care on May 31, 2018*

Pope's final allegation relates to care she received on May 31, 2018. She alleges that RN Fiorini "interfered with another nurses [sic] assessment to avoid her duties as a nurse [sic] and report my condition to the on call doctor." (ECF No. 1, PageID.19). Pope explains in her deposition that RN Fiorini told the nurse who was treating Pope not to call a doctor:

> …Nurse Fiorini tried to get her to not send me out because she felt like, "Okay. She has an appointment coming up. It's not that serious. She'll be seen in a couple of days." And I told that nurse, "I'm sitting here coughing up blood and here you go, and I bring it to you." Because they -- and after having that conversation with that nurse, she ignored Fiorini and she called the online doctor and they sent me out to the hospital.

(ECF No. 88-6, PageID.1772; *see* ECF No. 1, PageID.19). According to Pope, RN Fiorini shared her medical opinion with the treating nurse, but the treating nurse disregarded RN Fiorini's opinion. The treating nurse notified Dr. Pei of Pope's condition and, on his recommendation, sent her to the hospital that evening, where Pope was evaluated for "upper respiratory infection and lesions on my lungs." (ECF No. 1, PageID.20; ECF No. 88-9, PageID.1832). Pope provides no evidence that she did not receive adequate medical care that evening, and the evidence does not establish any delay whatsoever in her receiving treatment because, as Pope alleges, the treating nurse "ignored" RN Fiorini's opinion. Since the treating nurse took these actions notwithstanding RN Fiorini's suggestions, Pope fails to show that she was harmed by RN Fiorini's conduct.

**D.     Conclusion**

For the foregoing reasons, **IT IS RECOMMENDED** that Defendants' Motion for

Summary Judgment **(ECF No. 131)** be **GRANTED**.


Dated: December 22, 2025                    s/David R. Grand
Ann Arbor, Michigan                          DAVID R. GRAND
                                             United States Magistrate Judge


**<u>NOTICE TO THE PARTIES REGARDING OBJECTIONS</u>**

Within 14 days after being served with a copy of this Report and Recommendation,

any party may serve and file specific written objections to the proposed findings and

recommendations and the order set forth above. *See* 28 U.S.C. §636(b)(1); Fed. R. Civ. P.

72(b)(2); E.D. Mich. LR 72.1(d)(1). Failure to timely file objections constitutes a waiver

of any further right of appeal. *See Thomas v. Arn*, 474 U.S. 140, (1985); *United States v.*

*Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). Only specific objections to this Report and

Recommendation will be preserved for the Court's appellate review; raising some

objections but not others will not preserve all objections a party may have. *See Smith v.*

*Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987); *see also*

*Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596-97 (6th Cir. 2006). Copies of any objections

must be served upon the Magistrate Judge. *See* E.D. Mich. LR 72.1(d)(2).

A party may respond to another party's objections within 14 days after being served

with a copy. *See* Fed. R. Civ. P. 72(b)(2); 28 U.S.C. §636(b)(1). Any such response should

be concise, and should address specifically, and in the same order raised, each issue

presented in the objections.

.

## **CERTIFICATE OF SERVICE**

     The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or First Class U.S. mail addresses disclosed on the Notice of Electronic Filing on December 22, 2025.

                             s/Eddrey O. Butts
                             EDDREY O. BUTTS
                             Case Manager